UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

PERSEVERANZA S.P.A.,

                    Plaintiff,

      - against -                    ECF Case

AGRENCO MADEIRA COMERCIO INTERNACIONAL :
LDA, and AGRENCO GROUP a/k/a AGRENCO LTD,

                    Defendants.

-------------------------------------------------------------

## VERIFIED COMPLAINT

Plaintiff, PERSEVERANZA S.P.A. (hereinafter "Perseveranza" or "Plaintiff"), by and

through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against

the Defendants, AGRENCO MADEIRA COMERCIO INTERNACIONAL LDA hereinafter

"Agrenco Madeira"), AGRENCO GROUP (hereinafter "Agrenco Group") a/k/a AGRENCO

LTD. (hereinafter "Agrenco Ltd.") (collectively "Defendants") alleges, upon information and

belief, as follows:

     1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of a maritime contract of charter. This matter also arises under the Court's federal

question jurisdiction within the meaning of 28 United States § 1331.

     2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity organized and existing under foreign law with an office and place of

business in Naples, Italy.

     3.     Upon information and belief, Defendants were, and still are, a foreign corporation

or other business entity organized and existing under foreign law with offices in Brazil.

4. At all times material to this action, Plaintiff was the owner of the vessel M/V "FUJIAN" (renamed "GURASIS") (hereinafter the "Vessel").

5. By a charter party contract dated February 18, 2007, (hereinafter the "Charter Party") Plaintiff time chartered the Vessel to Defendant Agrenco Madeira for a minimum period from February 12/13, 2007 until July 1, 2008 up to a maximum period until August 31, 2008. *A copy of the Charter Party is annexed hereto as Exhibit 1.*

6. Defendant Agrenco Group a/k/a Agrenco Ltd. "fully guaranteed" the performance of the charter party by Agrenco Madeira. *See Exhibit 1 annexed hereto.*

7. The Vessel is presently scheduled to be redelivered by Agrenco Madeira on August 16, 2008 at Tsuruga, Japan.

8. In accordance with Clause 5 of the Charter Party contract, Defendants were obligated to pay hire to Plaintiff "every 15 days in advance". In accordance with Clause 3 of the Charter Party contract Defendants were required to "take over and pay for all fuel remaining on board the vessel and in accordance with Clause 54 the vessel was to be redelivered with 1,500 metric tons of IFO and 80 metric tons of MDO bunkers on board at a price of $300 and $600 per metric ton respectively. *See Exhibit 1 annexed hereto.*

9. Plaintiff has prepared its Final Hire Statement to be issued to Defendants for sums due and owing from Defendants to Plaintiff, comprised of: unpaid hire in the amount of $498,961.98 and bunkers in the amount of $324,550.00. *See Exhibit 2 annexed hereto.*

10. Despite its obligations as set forth above in Paragraph 9, and despite Plaintiff's due demand, Defendants failed and refused to pay the outstanding hire and failed to redeliver the Vessel with the minimum amount of bunker fuel required.

11. At all material times Plaintiff duly and fully performed its duties and obligations under the Charter Party.

2

12.     Defendants' failure to pay Plaintiff the outstanding hire and to redeliver the Vessel with the minimum quantity of bunkers constitutes a breach of the Charter Party contract.

13.     Plaintiff has suffered damages as a result of the Defendants' breach of the Charter Party contract.

14.     Pursuant to Clause 55 of the Charter Party, all disputes between the parties are to be submitted to arbitration in London with English Law to apply. *See Exhibit 1 annexed hereto.* Plaintiff will commence arbitration once jurisdiction is obtained over Defendants in this action.

15.     This action is brought to obtain jurisdiction over the Defendants in aid of the arbitration proceeding to be commenced and to obtain security for Plaintiff's claims.

16.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.

17.     As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---|
| a. | Principal Claim: | $ 823,511.98; |
| b. | Interest on principal claim:<br>[3 years, compounded quarterly at 5.27%] | $ 140,058.54; |
| c. | Estimated arbitration costs: | $ 35,000.00; and |
| d. | Estimated recoverable legal fees and costs: | $ 250,000.00. |
| **Total:** | | **$1,248,570.52** |

18.     The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

3

held in the hands of one or more garnishees which are believed to be due and owing to the Defendants. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit 3.*

19.     The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claims as described herein.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Verified Complaint

B.     That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court recognize and confirm any foreign judgment or arbitration award rendered on the claims had herein as a Judgment of this Court;

C.     That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property of the Defendants within the District, including but not limited to any funds held by any garnishee, which are due and owing to the Defendants, up to the amount

of $1,248,570.52, to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

D.      That this Court enter Judgment against Defendants on the claims set forth herein;

E.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.      That this Court award Plaintiff its attorney's fees and costs of this action; and

G.      That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: August 13, 2008
      New York, NY

The Plaintiff,
PERSEVERANZA S.P.A

By:

Patrick F. Lennon
Kevin J. Lennon
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 – phone
(212) 490-6070 – fax
pfl@lenmur.com
kjl@lenmur.com

5

## ATTORNEY'S VERIFICATION

1.    My name is Kevin J. Lennon.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on the Plaintiff's behalf.

Dated:        August 13, 2008
              New York, NY

                                        _____
                                        Kevin J. Lennon

6

# EXHIBIT 1

# Time Charter

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1. **This Charter Party,** make and concluded in Genoa, ............................................ ..Rit...... day of ..February 2007 ...... 19.

2. Between Messrs. *PERSEVERANZA S.P.A., NAPLES, ITALY* ............................................

3. Owners of the good ........................ Steamship/Motorship *"FULVIA"* For vessel's description see Clause 29 et

4. of ........................................................................... ~~tons gross register, and~~ ........................~~tons net register, having engines of...~~ ................... indicated horse-power

5. ~~and with full machinery and equipment in a thoroughly efficient state, and classed~~ ................................................................

6. at .............................................. of about .......................................... ~~cubic feet bale capacity, and about~~ .......................... ~~tons of 2240 lbs.~~

7. ~~deadweight capacity~~ (cargo and bunkers, including ~~fresh water and stores not exceeding~~ one and one-half percent of ship's ~~deadweight capacity,~~

8. allowing a minimum of fifty tons) ~~on a draft of~~ .......................... feet ................ ~~inches on~~ ............................ ~~Summer freeboard, inclusive of permanent bunkers,~~

9. which are of ~~the capacity of about~~ ........................................................................ ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10. ~~conditions about~~ ............................ knots ~~on a consumption of about~~ ............... ~~tons of best Welsh coal—best grade fuel oil - best grade Diesel oil,~~

11. now expected to arrive *February 9th, 2007 to discharge a full cargo of coal with ETC February 12th/13th, 2007 till going well, weather*

12. permitting, unforseen circumstances excluded) and Messrs. *AGRENCO MADERA, fully guaranteed by AGRENCO GROUP* Charterers

13. of the City of ........................................................................................................................................................................

14. **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

15. about a period minimum 1st July 2008 upto maximum 31st August 2008 ........................................................................

16. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17. the fulfillment of this Charter Party. ............................................................................ within below-mentioned trading limits.

18. Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot CARRONERAS at any time day and night Sundays*

19. and Holidays included ........................................................................................................................................................

20. in such dock ~~or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided for in clause No. 6),~~ ~~as~~

21. ~~the Charterers may direct. If such dock, wharf or place be not available, time to count as provided for in clause No. 5.~~ Vessel on her delivery to be

22. ready to receive cargo with clean dry cargo spaces to independent surveyor's satisfaction ~~except~~ holds and tight, staunch, strong and in every way

23. fitted for the service, having water ballast, winches and ........................................................................................................................

24. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

25. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

26. dise, including petroleum or its products, in proper containers, excluding ~~see Clause 30.~~ ........................................................................

27. ~~(vessel is not to be employed in the carriage of Live-Stock, but Charterers are to have the privilege of shipping a small number or livestock on deck at their risk,~~

28. all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

29. ~~America, and/or United States of America,~~ and/or ~~West Indies,~~ and/or Central America, ~~and/or~~ Caribbean Sea, ~~and/or~~ Gulf of Mexico, ~~and/or~~

30. Mexico, and/or South America, *world wide within Institute Warranty Limits, see Clause 41* ........................................ ~~and/or Europe~~

31. and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magellanes River, River St. Lawrence between

32. October 31st and May 15th, Hudson Bay, and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,

33. Trading exclusions as per Clause 41. ........................................................................................................................................

34. ........................................................................................................................................................................

1st ORIGINAL

35
36 as the Charterers or their Agents shall direct, on the following conditions:

1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew, *fees by authorities*
37 *on crew and/or vessel unless owing to the default of Charterers (see Clause 89)*; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *also for garbage removal but*

38 *compulsory garbage removal to be for the Charterers' account and lubricating oil* and maintain her class and keep the vessel in a thoroughly efficient state in hull, *cargo spaces*, machinery and equipment *her class, great for provision, crew and trading certificates valid, Vessel to have all other certificates necessary to comply with current requirements at ports of call (see Clause 29)* for and during the service.

39 2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory* Pilotages, Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but what the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 charter to be for Charterers account. All other fumigations to be for Charterers account. ~~All other fumigations to be for Charterers account~~ ~~All other fumigations to be for a continuous period~~
44 ~~of six months or more.~~

45 Charterers are to provide necessary dunnage and shifting-boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting-boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.

48 3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49 board the vessel ~~at the respective ports~~, the vessel to be delivered with not less than ................... tons and not more than .................. tons, and the
50 ......................... tons and to be re-delivered with not less than ................... tons and net more than ................... tons. *Prices (see Clause 54)*
51

52 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of an *agreed (see Clause 99)*
53 ............................... United States Currency per-ton-vessel's total deadweight carrying capacity-including bunkers and
54 ~~stores-on~~ ........................ summer freeboard, per Calcndar Month, commencing on and from the day of her delivery, as aforesaid, and at
55 and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
56 wear and tear excepted, to the Owners (unless lost) *as on dropping outward last sea pilot at any time day and night Sundays and Holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/10* days approximate
57 notice of vessel's expected date of re-delivery, and probable port *and 5/3/2/1 days definite notice*.

58 5. Payment of said hire to be made in New York in cash in United States Currency, *every 15 days semi-monthly* in advance, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers; otherwise failing the punctual and regular payment of the
61 hire, or bank-guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from *7 a.m. on the working day*
63 following that on which written notice of readiness has been given to the Charterers or their Agents before 4 p.m., but if required on the working day
64 ~~to have the privilege of using vessel at once, such time used to count as time.~~ *See Clause 45*

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at *such places Argentina, Brazil and Uruguay* where it is customary
70 for similar size vessels to safely lie aground.

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege-of-passengers-or-for-5c-accommodations-allow-Charterers

74  paying Owners ............................................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75  incurred in the consideration of the carriage of passengers Charterers are to bear such risk and expense.
76
77  8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
78  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
79  agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision *and responsibility* of the Captain,
   who is to sign *or authorize the Charterers or their Agents to sign on his behalf the* Bills of Lading for
   cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *With reference to line 78 it is clearly understood that the words "and*
   *responsibility" do not apply to damages caused to the vessel. If the Charterers and/or their Agents and/or their servants of the*
   *Charterers, including stevedores, have caused the damage(s), the Charterers will be liable.*
79
   9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
   receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
80  10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
81  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
82  rate of $1.5.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
83  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal *of USD 5.00,* for all such victualling. *Charterers are to pay a*
84  *lumpsum of USD 1,250.- perm omb pro rata for communication charge including entertainment.*
85
86  11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel. *Master to adhere strictly to Charterers' instructions giving ETAS and required NORS.*
90  12.   That the Captain shall use diligence in caring for the ventilation of the cargo.
91
92  13.   That the Charterers shall have the option of continuing this charter for a further period of ...................................................................................................................
93  on giving written notice thereof to the Owners or their Agents ..............................................days, previous to the expiration of the first named term, or any declared option.
94  14.   That if required by Charterers, time not to commence before *February 12th, 2007*.........................................................and should vessel
95  not have *been delivered* given written notice of readiness on or before *February 19th, 2007*............................................................................but not later than 4 p.m. Charterers on
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *See   Clause   35*
97  15.   That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency of* stores, fire, breakdown or damages
98  to hull, machinery or equipment,
   grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, *pollution* or by any other cause
   *whatsoever*
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all expenses and losses to be deducted from*
   *hire,* and if upon the voyage the speed be reduced by *reason other than adverse weather conditions and currents*
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all *directly related* extra expenses shall be deducted from the hire.
102 16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107 17.   That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *arbitration in London* three
108 persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their *arbitrators* decision or that of any two of them, shall be final, and for
   the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. *See Clause 55*
109 and for
110 18.   That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-timecharter hires* for any amounts due under this Charter,

111 including General Aver-

112 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

113 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

114 might have priority over the title and interest of the owners in the vessel.

115 19.    That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116 Crew's proportion. ~~General Average shall be adjusted, stated and settled, according to Rules~~ *to 1 to 15, inclusive, 17 to 22,* ~~inclusive and Rule F of~~

117 ~~York-Antwerp Rules~~ *1994 as updated in London and any later amendments thereto* ~~1974, at such port or place in the United States or may be~~

118 ~~selected by the carrier, and as to matters not provided for by these~~

119 Rules, according to the laws and usages at the port of *London New York.* In such adjustment disbursements in foreign currencies shall be exchanged into

120 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

121 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or

122 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier

123 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

124 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the

125 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

126 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

127 United States money. *Here not to contribute to General Average.*

128 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,~~

129 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

130 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

131 ~~losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the~~

132 *goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for in full as if the same salving ship or*

133 ~~ships belonged to strangers.~~

134 20.    Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the

135 cost of replacing same, to be allowed by Owners.

136 21.    ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

137 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

138 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

139 *No dry-dock for the duration of this Charter Party except in an emergency.*

140 Provisions as to General Average in accordance with the above, are to be included in all bills of lading issued hereunder.

141 22.    Owners shall maintain the gear of the Ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also

142 providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for

143 same, otherwise heavier lifts shall be for Charterers' account. Owners also to provide *and maintain sufficient lights on deck*

144 and in cargo spaces on the vessel lanterns and oil for

145 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

146 Charterers to have the use of any gear *and lights* on board the vessel.

147 23.    Vessel to work night and day, and all *equipments* winches to be at Charterers' disposal during loading and

148 discharging.

149 24.    ~~It is also mutually agreed that their Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

150 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

151 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

152 ~~of which are to be included in all bills of lading issued hereunder:~~

U.S.A. Clause Paramount

155
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both-to-Blame Collision Clause

160
161 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.

167 25.   The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170 26.   Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.
172 27.   A commission of 2-1/2 0.25 per cent is payable by the Vessel and Owners to *Calliope Shipping Srl Rome*
173 ..................................................................................................... on the hire earned and paid under this Charter.
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28.   An address commission of 2-1/2 3.75 per cent payable to ....*Charterers*................................................... on the hire earned and paid under this Charter.

*Clauses 29 to 162 inclusive as attached hereto, are deemed to be fully incorporated in this Charter Party.*


### THE OWNERS

### THE CHARTERERS


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out or use of a larger font and marked as having insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

Page 1

ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
M/V "FUTIAN" DATED FEBRUARY 8TH, 2007

**Clause 29.   Description - All details "about"**

| | |
|---|---|
| Type / Self-trimming | Yes |
| Flag | Netherland Antilles |
| Built | 1997 |
| Official Number | 5572 |
| Port of Registry. | |
| Class | GT |
| Ice-Class / Ice-strengthened | No |
| | |
| Call Sign | |
| Telex Number | |
| Fax Number | No |
| Phone Number | No |
| | |
| Suez Fitted | Yes |
| Panama Fitted | Yes |
| Grain Fitted | Yes |
| CO2 Fitted in Holds | No - exempted |
| ITF – Fitted | Yes (see Clause 61) |
| Australia Hold Ladder Fitted | Yes |
| Box-shaped | No |
| | |
| International GRT / NRT | 39,385 / 24,519 |
| Suez GRT/NRT | 39,000 / 36,352 |
| Panama GRT/NRT | 32,566 |

Speed consumption mts/day   14.5 knots on 28 metric tons ballast
14.0 knots on 33.5 / 25.0 laden / ballast
13.5 knots on 31.0 / 22.0 laden / ballast
13.0 knots on 29.0 / 20.0 laden / ballast
Plus 2 metric tons IFO for tail shaft genocrator at sea

In bad weather meaning in conditions exceeding Beaufort 6 and Douglas Sea State 5, Vessel's shaft generator will be switched off and instead of 2 metric tons IFO as stated above vessel will burn 2 metric tons Marine Gas Oil instead.

| | |
|---|---|
| Port consumption | 2 metric tons MGO plus 1.5 metric tons IFO |
| Fuel Quality | HFO 380 CST / RMG 35 ISO 8217 – 1996 E |
| | MGO / DMA ISO 8217 – 1996 E |
| | |
| Capacity UFO in mts: | 2099 at 100% full capacity |
| | (S.G. of HFO |
| | 0.95t/m3 at 50+c) |

Capacity MDO in mts                    219 at 100% full capacity (MDO 0.85)
t/m3at 15+c)
Capacity FW in mts                     270 at 100% full capacity
Constants in mts                       About 500 mts

Type and power of main engine:         Sulzer 5RTA 62-12800 BHP CSR
Deadweight in mts                      75.339
Draft ssw fully laden                  14.34
TPI fully laden                        172.2
LO A in metres                         225.0
Breadth in metres                      32.24 extreme

Highest point above keel in metres:  39.2

Height waterline to top of hatchcoaming in
fully ballasted condition in mt:       12.26 mt Corpus Christi suitable
heavy ballast including flooding
of one hold in mt                      12.02 mt

Holds                                  7
Hatches                                7

Grain per hold in cubic feet           Bale x Hold in cubic feet: N/A

1:    379,600.9
2:    441,720.0
3:    446,487.0
4:    446,487.0
5:    446,487.0
6:    446,487.0
7:    400,083.9
Total: 3,007,352.8

Hatch Sizes in metres              1:    16.2x12.0/11.2
                                   2/7:  16.2x14.6/11.2

Hold Sizes in metres               1:    27.2x30.4/16.6
                                   2/7:  32.2x24.6/16.6

Type of hatchcovers                Side-rolling + n+1 piggy back

Area tanktop in sqm                3.233 about

Tanktop strength in mts/sqm        28.5 / t / m2

Vessel's dwat on following drafts and TPf/TPC

|            | Dwat in mts | TPJ/TPC        |
|------------|-------------|----------------|
| 17'fw      | 16,150      | 151.4 / 59.40  |
| 30' fw     | 40,000      | 159.7 / 62.90  |
| 32' fw     | 43,950      | 162.3 / 63.90  |
| 32.6' bw:  | 45,740      | 162.41 / 63.45 |
| 37 bw      | 54,500      | 165.9 / 63.35  |

Gear            No

Owners' P. and I. Club: Gard, Arendal / Norway

All details are 'about' and given in good faith.

### Clause 30.   Cargo Exclusions

Livestocks, logs, acids, explosives, arms and ammunition, nuclear material, asphalt and pitch in bulk, creosoted goods, all injurious and dangerous goods, scrap including motor blocks and turnings, fish meal, soda ash, direct reduced iron, toxic and chemical waste, hot briquetted iron., ferro silicon, silica sand, silver sand, nepherline syenite, salt, ferro silicon in bags, calcium hypachlorite, cement, oxiton and concentrates.

Charterers' option to load 1 voyage per annum with salt.
One cargo of sulphur allowed and same only to be allowed after 1st January 2008.

If sulphur is loaded following to apply:

The holds to be thoroughly washed by vessel's crew at the Charterers' time and expense. Subject to the provisions below, lime-coating of holds for the carriage of sulphur, whether requested by Shippers or Charterers or Owners to be arranged by vessel's crew at the Charterers' time and expense.
Similar procedure to apply for the lime coating removal.
The above operations and the carriage of sulphur to be arranged at the Charterers' risk.
Crew to perform above precautions concerning above cargoes against a mutually agreed crew bonus and the Charterers are to supply all necessary equipment which is needed including lime, freshwater if needed in quantities not available on board, scaffolding and/or cherry pickers.
Any forms of hold preparation always subject to permission being granted from shore and no conflict with shore labour regulations. Any claim resulting from work ordered by the Charterers to be performed by crew to be the Charterers' responsibility and always in Charterers' time and expense' All cargoes to be loaded and carried as per IMO / U.S. Coast Guard or similar authorities regulations including SOLAS.

In case of loading salt cargoes, cargo holds are to be lime-coated for each voyage by crew against a mutually agreed bonus at the Charterers' time and expense prior to loading. Equipment and materials for same to be supplied by Charterers.

Ammonium nitrate fertilisers may be loaded provided same are always loaded / stowed / carried and discharged in accordance with IMO and local port regulations, vessel's Certificate of Compliance for the carriage of dangerous goods as well as in accordance with rules and regulations of vessel's Classification Society and vessel's exemption certificate of the flag state.

Iron ore concentrates may be carried during this Charter period provided the cargo is always loaded, stowed, carried and discharged in accordance with IMO, Solas and local port regulations as well as in accordance with regulations of ports and canals in transit. Charterers' option to load one cargo per annum of pig iron ex Punta da Madeira provided any time lost and any extra expenses incurred by loading pig iron ex Punta da Madeira to be for Charterers' account.

### Clause 31.    BIMCO Double Banking

(a)    The Charterers shall have the right, where and when it is customary and safe for Vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessel to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d)    The Owners shall be entitled to insure any deductible under the vessel 's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or (he cost of insuring any deductible under the Vessel's hull policy.

(e)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### Clause 32.    Panama / Suez Canal transit, Grain loading, A.H. Ladder fitting

Vessel to be fully fitted and certificated for the transit of Panama and Suez Canals. Vessel also to be fully grain fitted able to load a full cargo of grain in accordance with Solas 69 or 74 and any amendments thereto. Vessel is also fitted with Australian Hold Ladders. Vessel to be off-hire for any period of time lost owing to Owners failure to comply with this clause and all relevant expenses and losses to be for Owners' account.

### Clause 33.    Flag / Boycott
The vessel will fly the Netherlands Antilles flag.

In case vessel is blacklisted and/or boycotted and/or delayed and/or restricted in the use of any port, loading or discharging facilities, labour, tugs, or pilotage assistance, owing to vessels ownership, flag, crew, crew complement, or crew wages, hire shall cease for any period of time lost thereby and all relevant expenses and losses to be for Owners' account.

### Clause 34.    Arrest
If the vessel is arrested during the currency of this Charter by any authority or at the suit of any person having or purporting to have a claim against the vessel, hire shall cease for the period during which the vessel remains under arrest or unemployed as a result of such arrest and the Owners shall reimburse Charterers for any directly related costs incurred thereby. This clause does not apply for claims against the Owners and/or their agents for which Charterers are liable.

### Clause 35.    Laydays / Cancelling and Delivery notice
Laydays/Cancelling   February 12th/19th, 2007
Owners are to give Charterers not less than 30/25/20/15 days approximate notice of delivery and 10/7/5/3/2/1 days definite notice.

### Clause 36.
Deleted.

### Clause 37.    Deviation
If the vessel puts back or deviates on a voyage by reason of any accident, to land sick or injured seaman, to receive or to offer salvage services, to carry out works pursuant to the quality warranty or any other provision of the shipbuilding contract, to carry out maintenance work or repairs or to undergo drydocking or Classification Society surveys, the hire shall cease from the time the vessel puts back or deviates until she is again at the same or equivalent position or at Charterers* option in another position which will not be further away than the position where from the vessel originally put back or deviated, and the voyage resumed therefrom.

### Clause 38.   Insurance
Owners guarantee that vessel will be covered on full terms and for her full value of TBA for hull and machinery insurance and will remain so for the whole duration of this Charter. Owners have the option to alter the value of their hull and machinery insurance informing Charterers immediately of the change. Charterers to have the benefit of any return insurance premium receivable by Owners from underwriters by reason of vessel being in port for a minimum of 30 days provided vessel is on hire. Furthermore, the vessel will also be entered in the Gard, Arendal, Norway (member of the international Group) on full terms for the duration of this Charter. Charterers to have the benefit of the Owners' P. and I. Club cover as far as the rules permit.

The vessel will also be covered by a first class War Risk Insurance Association for the whole duration of this Charter. The basic war risk insurance premium shall be for Owners' account and additional premium and crew war bonus shall be for Charterers' account. Valuation for the purpose of estimating such additional premium is as follows:

Hull and machinery:        (to be advised).

Furthermore the vessel to be fully covered against pollution by oil.

### Cause 39.   Oil Pollution
Owners are required to establish and maintain financial security for responsibility in respect of oil or other pollution damage as required by any government including federal state or municipal or other division or authority thereof, to enable the vessel, without penalty or charge lawfully to enter, remain at or leave any port, place territorial or contiguous waters of any country, states or municipality in performance of this Charter without any delay.

This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof, Owners shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Owners sole expense and Owners shall indemnify Charterers against all consequences (including loss of time) and all expenses and costs of any failure or inability to do so.

### Clause 40.   Intermediate Hold Cleaning
Intermediate hold cleaning US$ 500 per hold for sweeping only and US$ 700 per hold for sweeping and washing. The Owners will endeavour to effect such cleaning as well as possible but without any guarantee that the cargo holds will be sufficiently cleaned and acceptable on arrival at the loading port. However Owners are not to be held responsible if vessel fails any inspection due to such intermediate hold cleaning except for rust or rust scale in which case vessel to be put off-hire from time of rejection till she passes again the inspection and all extra expenses incurred to be borne by Owners. Above is always subject to the availability of the crew, sufficient time and subject to local and port regulations.

### Clause 41. Trading Exclusions

Worldwide trading between safe anchorages, berths, ports or rivers where vessels of this size are usually navigating always afloat within Institute Warranty Limits excluding Finland, Norway, Israel, Syria, Lebanon, Cambodia, North Korea, White Sea, Iceland, Angola, Cuba, C.I.S. Pacific Ports, Somalia, Liberia, Ethiopia, Zaire, Haiti, Georgia, Iran and all other war risked countries which result in blacklisting or sanctions by the United Nations.

The Charterers guarantee that they will not trade the vessel directly between P.R.C, and Taiwan or vice versa and also that they will not trade the vessel for consecutive voyages between Trombetas and the Orinoco River.

Should the political, social and/or other situation for a normal trading of the vessel in the above allowed or excluded countries / area change, then such country(ies) / area(s) shall be excluded or allowed through the mutual discussions, agreement and conditions.

Charterers have the option to break Institute Warranty Limits after Owners' prior approval.

Such approval not to be unreasonably withheld and Charterers thereby paying any additional extra insurance premium on the hull and machinery against Owners' vouchers and disbursements actually paid by Owners for breaking such limits.

Although above, Charterers have the option to trade country / region / zones breaking war risk warranties but subject to Owners' prior approve which not to be unreasonably withheld. Any additional war risk insurance premium and crew war bonus to be for Charterers' account.

### Clause 42. Self-trimming, shape of holds, grab discharge

Owners guarantee vessel is suitable for discharge by grabs customarily used by Charterers and Receivers but grabs not to exceed vessel's tanktop strength.

The vessel to be free of obstructions in holds and hatches, suitable in every respect for carrying all cargoes allowed under this Charter Party. The vessel will comply with all current trading regulations. The vessel is self-trimming and can carry full cargo of grain without bagging / strapping / securing.

### Clause 43. Stevedore Damages

The Charterers are not responsible for stevedore or other damages to the vessel unless they or their agents are notified in writing by the Captain at the time of occurrence of damage, or as soon as thereafter, as practicable, but prior to the vessel's sailing from port of occurrence or latest 24 hours thereafter. The Captain to co-operate with Charterers and/or their agents in giving prompt notice of claim in writing to the party causing the damage and endeavouring to obtain written acknowledgement of liability of the party causing the damage. Hidden damages to be reported when discovered but prior to redelivery. Any repair affecting the vessel's class, her seaworthiness or commercial workability to be repaired by the Charterers immediately. Charterers may redeliver

vessel without repairing stevedoring damage incurred during the currency of this Charter for which they might be liable in which case they will reimburse Owners for the cost of repairs as estimated by a surveyor mutually appointed.

### Clause 44.    Deduction of Owners' account

The Charterers shall be entitled to deduct from hire payment any disbursements for Owners' account, supported by vouchers, or estimated amounts of disbursements or any advances to the Master including commission thereon, but maximum US$ 1,000 per port, any previous overpayments of hire and any other expenses for Owners' account. The Charterers shall be also entitled to deduct from payments estimated costs of bunkers on redelivery from last sufficient hire payment.

### Clause 45.    Grace Period for hire payment

Referring to Clause No.5, where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of Charterers' employees, bankers or agents or otherwise where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners three (3) banking days notice to rectify the failure. Where so rectified the payment shall stand as a "punctual and regular payment".

### Clause 46.    Sale of the Ship

Owners do not have the right to sell the ship or change her flag during the currency of this Charter without obtaining Charterers' prior written agreement.

### Clause 47.    Hold Condition on Redelivery

The vessel is to be redelivered with her holds in like condition as on delivery; Charterers have the option to redeliver the vessel unclean as left by stevedores against paying US$ 5,000 in lieu of hold cleaning.

This however does not apply if last cargo prior to redelivery is petcoke, sulphur or salt in which case the Charterers are to redeliver the vessel with clean, swept, washed down (with freshwater) and dried holds free of any cargo residues, all at Charterers' expense.

### Clause 48.    Paramount Clause

New Jason Clause, New-Both-to-Blame Collision Clause, Chamber of Shipping War Risks Clauses 1 and 2 and Clause Paramount as attached to apply to this Charter and to be inserted in any Bill of Lading issued under, if so required by Charterers or their sub-Charterers.

#### Clause 49.   Funnel Mark

Owners will paint vessel in Charterers' colours including painting of Charterers' markings on vessel's funnel, provided same is allowed by local port regulations. Vessel's crew to paint Owners' markings on vessel's funnel prior redelivery, the expenses of which shall be settled by Charterers directly with Master.

#### Clause 50.   Lay-Up

The Charterers shall have the right to order the laying-up of the vessel at any time and for any period of time at a safe berth or place and give the Owners at least 20 days advance notice. In the event of such lay-up the Owners shall take prompt steps to effect all the economies in operating costs including insurance which maybe possible and give prompt credit to the Charterers in respect of all such economies, if any. At the request of Charterers at any time the Owners shall furnish an estimate of the economies which would be possible in the event of laying-up of the vessel. The lay-up site to be proposed by Charterers but shall always be safe and to be mutually agreed by Owners and Charterers.

Owners' statement of credits shall be balanced with debts for costs incurred by such laying-up, such as crew repatriation expenses and estimated costs for putting vessel back into service, such as removal of marine growth.

#### Clause 51.   On / Off-hire Survey

A joint on-hire bunkers and condition survey to be performed at delivery port by a mutually accepted surveyor. A joint off-hire bunkers and condition survey to be performed at redelivery or last discharging port in Charterers7 option by a mutually accepted surveyor. Time used for the on-hire survey to be for Owners' account and time used for the off-hire survey to be for Charterers' account. Costs of surveys to be equally shared between Owners and Charterers.

Whenever requested Owners to allow Charterers to ascertain quantities of bunkers remaining on board at Charterers' time and cost.

#### Clause 52.   Fresh Water Consumption

Freshwater consumed under this Charter Party by stevedores and/or for the purpose of hold cleaning and/or for Charterers' business in excess of vessel's freshwater generating capacity shall be for Charterers' account.

#### Clause 53.   Hire Payment

Hire to be remitted in U.S. Dollars by telex 15 (fifteen) days in advance to Owners' bank.

Owners' banking details :
BANCA DI ROMA
HEAD OFFICE OF NAPOLI
VIA VERDI, 31 – 80133 NAPOLI
IBAN            IT31K0300203422USD000047936
USD ACCT NO     00007936
IN FAVOUR OF    PERSEVERANZA SPA
FOR             MV FUJIAN / INLOGS CP DTD 08/02/07

### Clause 54.    Bunkers

The vessel to be delivered with about 1500 metric tons IFO and about 80 metric tons MDO and to be redelivered with about same quantities as actually on board on delivery. Bunker prices on delivery and redelivery to be US$ 300.- .per mt IFO and US$ 600.- per mt MDO.

Charterers to add the cost of bunkers to first hire payment and Charterers have the right to deduct cost of bunkers from last sufficient hire statement Charterers / Owners to have the privilege to bunker the vessel prior to delivery / redelivery respectively provided same does not interfere with discharging operations.

### Clause 55.    Arbitration

All disputes arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London.

Unless the parties agree upon a sole arbitrator, the reference shall be for a tribunal of two arbitrators, one to be appointed by each of the parties, who will have the power to appoint an umpire if they disagree. The Arbitrators and umpire shall be members of the London Maritime Arbitrators' Association or otherwise qualified by experience to deal with commercial shipping disputes.

The contract is governed by English Law and there shall apply to arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the arbitration proceedings are commenced.

### Clause 56.    NAABSA

Owners agree to allow the vessel calling at Brazil, Argentina and Uruguay, if available, subject to sufficient draft and lie there at any times of tide at a good and safe berth, not always afloat but Charterers guarantee safely aground. In consideration of the above, Charterers hereby indemnity Owners from any damages to the vessel in consequence of her lying aground and accept responsibility of any^ costs and damages incurred as a result, and vessel shall remain on-hire at any time \ connected with such damage.

*ADDITIONAL CLAUSES TO THE CHARTER PARTY OF*
*M/V "FUJIAN" DATED FEBRUARY 8TH, 2007*

### Clause 57.   Insurance

Charterers confirm that they have Charterers' liability insurance with an internationally recognised P. and I. Club.

### Clause 58.   Employment Between Safe Ports

Charterers shall exercise due diligence to ensure that the vessel is only employed between and a safe ports but not withstanding anything contained in this or any other clause of this Charter, Charterers shall not be deemed to warrant the safety of any port and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid.

### Clause 59.   Final Voyage

Should the vessel be upon a voyage at then expiry of the period of this Charter (including the optional additional two months), Charterers shall have the use of the vessel at the same rate and conditions for such extended time as may be necessary for the completion of the final voyage on which she is engaged including her positioning to a port of redelivery as provided by this Charter.

Charterers to respect the original agreed period (including optional 4th and 5th year) and not to fix the voyage which obviously/clearly assumed to exceed maximum period including the optional additional month.

### Clause 60.   Israel Call and Arab Blacklist

The Owners guarantee that no other vessel owned, managed or controlled by them has ever traded to an Israeli port. The Owners also guarantee that neither the vessel nor any other vessel owned, managed or controlled by them is blacklisted by an Arab country.

### Clause 61.   ITF

Owners guarantee that during the Ownership, the vessel has not been blacklisted by countries / ports / areas allowed in the Charter Party. Owners guarantee during the whole Charter Party that the vessel is WWF / AHL fitted.

The vessel shall be at all times covered by an ITF agreement or other similar wage agreement acceptable to the ITF and Owners undertake that upon arrival at any port the Officers and crew will be covered by such an ITF or similar agreement acceptable to the ITF. AH consequences including loss of time / expense as a result of non-compliance to the above shall be for Owners' account and can be deducted from the hire.

### Clause 62.   Weather Bureau

The Charterers may supply and independent Weather Bureau ("Oceanroutes" or other similar international standard, the latter to be mutually agreed) advice to the Master during voyages specified by the Charterers. Evidence of weather conditions shall be taken from the vessel's deck logs and independent weather bureau reports.

In the event of a consistent discrepancy between the deck logs and the independent Weather bureau reports, irrespective of whether the weather bureau monitored vessel's performance during the Charter or analyses vessel's performance afterwards, the independent weather bureau finding shall be taken as ruling.

### Clause 63.   Adjustment of Off-Hire Period

Should the vessel be placed off hire during the currency of the Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the period during which the off-hire incurred by giving notice to the Owners at least 30 days before the expiration of the period during which the off-hire occurred. This shall not effect the Charterers' obligation to give redelivery notice of the vessel. The Charterers are in any event required to give redelivery notice as per Clause 4.

### Clause 64.   Cancelling by War

If major war breaks out between any two or more of the following countries: United Kingdom, U.S.A, Russia, People's Republic of China, Japan and Germany, directly affecting the performance of the Charter, both the Owners and the Charterers shall have the option of cancelling this Charter with mutual agreement whereupon the Charterers shall redeliver the vessel to the Owners in accordance with Clause 4, if she has cargo on board, after discharging thereof at destination, or, if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board at a port at which she stays or if at sea at a near safe port as directed by the Owners. In all cases hire shall be paid until the vessel's redelivery.

### Clause 65.   Requisition

Should the vessel be requisitioned by the government of the vessel's flag during the period of Charter, the vessel shall be deemed to be off-hire during the period of such requisition. If the period of requisition exceeds 3 months, Charterers shall have the option of cancelling this Charter and no consequential claim may be made by either party.

### Clause 66.   Deratting Certificate

The vessel shall be delivered with valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this Charter, costs of renewal of certificate and fumigation if necessary shall be for Owners' account Any detention and extra expenses incurred thereby shall be also for the Owners' account.

### Clause 67.   Quarantine

Normal quarantine time and expenses for the vessel entering port shall be for Charterers' account but any time of detention and expenses for quarantine due to pestilence, illness

etc. of Master, Officers and crew shall be for Owners' account. Any detention due to ports called or cargoes carried to be for Charterers' account.

### Clause 68.    Possession of Necessary Certificates

The vessel shall be in possession of necessary certificates to comply with safety and health regulations and all current requirements at all ports of call during this Charter. The Master, Officers and crew of the vessel shall hold vaccination certificates against yellow fever, cholera etc.

### Clause 69.    Loading Holds

The Owners guarantee that the vessel is a self-trimming bulker. The vessel shall have the latest grain loading certificate in compliance with IMO regulations on board. The vessel is also to load full or part cargoes and to shift between ports and berths with empty (holds 2/4/6 can be empty as per alternate hold loading shipbuilder's specifications) and/or slack holds (in case of grain loading, slack holds to be one or two without bagging, strapping or securing) which should fully comply with SOLAS regulations and port regulation for stability of the vessel, and always within vessel's loading manual constraints related to stability and stresses.

### Clause 70.    Equipment and Certificates

The vessel's equipment shall comply with regulations and/or requirements in effect at port or ports of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up-to-date certificate on board to comply with such regulations and/or requirements.

A particular reference is made to the U.S. Department of Labour and Safety and Health Regulations set forth in Part III Code of the Federal Regulations and all Australian Navigation (Loading and Unloading Safety Measures) Regulations, 1981 or any amendments thereto and related Regulations and Recommendations.

If stevedores, longshoremen or other labourers are not permitted to work by reason of any failure of the Master, the Owners and/or their agents to comply with such regulations or by reason that the vessel is not in possession of such valid up-to-date certificates, then the Owner shall make immediate corrective steps and the Owners to be liable for any direct additional costs incurred thereby.

### Clause 71.    Requirements of Australian Shore Labourers and Pilots

The Owners guarantee that the construction of the vessel with fittings and other equipment shall comply with the requirements and/or recommendations of Australian shore labourers and pilots.

#### Clause 72.    Agency

The agents appointed by the Charterers shall perform all normal services to the vessel and Master at a fee as per agency tariff but in cases when replacement of crew or repair or other major Owners' matters are required then owners to appoint their own agents. But in case Owners are unable to arrange same, Charterers shall agree to have their agents attend such matters with Owners paying agency fee according to Charterers' tariff with their agents, provided Charterers' agents agree to do so.

#### Clause 73.    Eligibility for Bunkering

The Owners guarantee that the vessel is eligible for bunkers in the United States of America and in any other country.

#### Clause 74.    Replenishment of Bunkers

Replenishment of bunker is arranged and paid for by the Charterers. The Master shall pay due diligence for replenishment of bunkers so as not to cause oil spillage while bunkering.

#### Clause 75.    Capture of the Vessel etc.

Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party, the payment of hire shall be suspended until the time of her release, and any extra expenses incurred by and or/during the above capture or seizure or detention or arrest but limited to all the expenses related to the release of the vessel (legal/agency/fees, travelling expenses etc.) shall be for Owners' account, unless such capture or seizure or detention or arrest is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of cargo or calling port or trading under this Charter.

#### Clause 76.    Smuggling

Any delay, expenses and/or fine incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew, or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

#### Clause 77.    Additional Equipment and Fittings

The Charterers, subject to the Owners and/or Master's prior consent shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers * expense and time and the Charterers shall remove such equipment and fittings at their expense an time prior to redelivery if so required by the Owners.

### Clause 78.    Communication and Entertainment Fee

The Charterers to pay the Owners US$ 1,250 monthly in lieu of all radio telegrams, telephone calls» etc. for Charterers' business in lieu of all entertainment fees including victualling incurred through ordinary course of the vessel's operation for Charterers' account.

### Clause 79.    Using Diesel Oil

Master shall have liberty of using diesel oil for starting/stopping of main engine and for manoeuvring in narrow/shallow water otherwise as per vessel's description.

### Clause 80.    Cargo Claim

Liability for cargo claim shall be borne by the Owners and the Charterers in accordance with the Inter Club New York Produce Agreement of February, 1970 and its amendments on May, 1972 and May, 1984 or any future amendments thereof.

### Clause 81.    Information of Vessel's Itinerary etc.

As far as is known the Charterers shall give the information of vessel's itinerary, kind of cargoes and names of agents at ports of call to the Owners upon Owners' request.

### Clause 82.    Slow Steaming

The Charterers to have the privilege of slow steaming the vessel at a speed acceptable to the vessel and machinery and hull.

### Clause 83

Owners agree that liability for cargo claims, as between Owners and Charterers, shall be settled in accordance with NYPE Interclub Agreement 1996 and any subsequent amendments thereto.

### Clause 84.    Charterers' Inspection

The Charterers and/or their supercargo shall be allowed to inspect engine room and bridge with the consent of Master which shall not be unreasonably withheld without interference of vessel's operation.

### Clause 85.    Weather Condition

The words "good weather conditions" in line 19 of this Charter Party shall mean any weather condition in which the wind does not exceed Force 4 on the Beaufort Scale and the sea does not exceed Douglas Sea State 3.

### Clause 86.  Cargo Release by L/G

Charterers and/or their agents are hereby authorised by Owners to sign Bill(s) of Lading on Master's / Owners' behalf. Bill(s) of Lading as presented but always in strict accordance with Mate's receipt and/or tally sheet. Charterers to be responsible for any and all consequences resulting from Charterers and/or their agents signing Bill(s) of Lading not adhering to the remarks in the Mate's receipt and tally sheet. In case of no original Bill(s) of Lading being presented to the Captain, Charterers have the right to order the Captain of the vessel to discharge and release the entire / relevant cargo in which case the Owners / Captain have no responsibility caused by such non-presentation of Bill(s) of lading.

The Charterers hereby state that they will indemnify the Owners in accordance with the Owners' P. and I. Club wording against all consequences arising from the Owners conforming to the Charterers' request to release cargo without original Bill(s) of Lading. The Charterers hereby surrender a Letter of Indemnity to the Owners strictly conforming with the Owners' P. and I. Club wording without bank guarantee.

Letter of Indemnity for clean on board and for predating Bill(s) of Lading etc., to be agreed case by case.

### Clause 87.  Pollution Claim

Charterers not to be responsible for any claim brought against the vessel and her Owners and/or her cargo for any pollution claim.

### Clause 88.  Bunker Quality

The Charterers are to supply bunkers in accordance with International Standard ISO 8217:1996, Class RMG 35 (for IFO) and MGO. Bunkers supplied by Charterers must be fit for use in vessel's engine and to be composed by straight minerals only.

### Clause 89.  Watchmen

Watchmen for cargo to be for Charterers' account and gangway watchmen to be provided by Owners, but where compulsory to employ and pay for gangway watchmen from shore, the expenses to be equally shared by Owners and Charterers.

### Clause 90.  Taxes / Dues

All taxes and/or dues imposed on cargo or freight to be for Charterers' account. Any tax and/or dues imposed on account of Owners, the vessel, the vessel's flag or crew and/or charter hire to be for Owners' account.

### Clause 91.  Dry-docking

NO dry-dock for the duration of this Charter Party except in an emergency.

### Clause 92. ISM Compliance

Owners guarantee that this vessel complies fully with the ISM code and is in possession of a valid safety management certificate and will remain so for the entirety of her employment under this Charter Party. Owners will provide Charterers with satisfactory evidence of compliance if required to do so and will remain fully responsible for any and all consequences arising directly or indirectly from any matters arising in connection with this vessel and the ISM Code.

### Clause 93. War Risk Insurance

Basic insurance premium for annual war risk insurance on hull and machinery to be for Owners' account. Any additional premium net of all rebates in respect of war risk arising from the vessel proceeding and trading at the Charterers' request to areas designated as excluded areas by vessel's war risk underwriters to be for Charterers' account but not exceeding the Lloyds scale. Crew war bonus for trading to restricted areas payable by Owners under the relevant crew contract, always to be for Charterers' account. Any blocking / trapping / detention insurance to be for Charterers' account.

### Clause 94. Cavalletto

Charterers have the option to discharge by means of mechanical crane on board i.e. Cavalletto which is to be put on board at Charterers1 time, risk and expense. Owners to guarantee vessel is Cavalletto suitable.

### Clause 95. Mobile Crane Clause

Mobile cranes to be allowed only in Taiwan and/or Thailand for discharge. Charterers / Shippers / Receivers have the right to place mobile cranes on deck loading and/or discharging port/s but always observing vessel's deck strength. Dunnage / wooden battens / welding of temporary tracks, if required for spreading weight of mobile cranes in order to comply with vessel's deck strength to be placed and removed by Charterers / Receivers / Shippers at their expense and in their time. Any damage caused to the vessel by mobile cranes and any modification / cutting of hatchcover stoppers required in this respect which is always subject to Owners' consent will be effected and repaired / restored by Charterers / Shippers / Receivers in their time and at their expense to the satisfaction of vessel's class surveyor.

### Clause 96. Dual Deadweight Clause

Vessel to have dual deadweight certificate 69,999 tons for Japan trading. Should dual deadweight be requested and any alterations be necessary to vessel's marks then same to be arranged by Owners and crew to paint/erase loadline marks at Owners' time/expense. Any checking of altered loadline marks by Class/Class surveyor to be for Charterers account.

*ADDITIONAL CLAUSES TO THE CHARTER PARTY OF*
*M/V "FUJIAN" DATED FEBRUARY 8TH, 2007*

**Clause 97.    BIMCO Stowaway Clause**

(a)    (I) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in thegoods shipped by the Charterers,

(II) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.

(III) Should the vessel be arrested as a result of the Charterers breach of charter according to sub-clause (a)(II) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

(b)    (I) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off-hire.

(II) Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time,, the vessel is released and at their expense put up bail to secure release of the vessel.

**Clause 98.    Period**
See line 14 in the front page.

**Clause 99.    Hire Rate**
USD 30.550.- daily including overtime.

**Clause.    100**
In the event of the Charterers ordering the vessel to port(s) where the vessel's stay is extended for more than 45 consecutive days or to lay-up which causes bottom fouling, the Charterers are to provide underwater cleaning at their time and expense, otherwise the Owners representation of vessel's speed and consumption to be null and void, effective from the vessel's departure from such port(s), unless or until so cleaned.

*ADDITIONAL CLAUSES TO THE CHARTER PARTY OF*
*M/V "FUJIAN" DATED FEBRUARY 8TH, 2007*

### Clause 101.   Hamburg Rules

Neither the Charterers nor their agents shall permit the issue of any Bills of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners) or on the Charterers' behalf or on behalf of any sub-Charterers incorporating, where not compulsorily applicable, the Hamburg Rules or any legislation imposing liabilities in excess of the Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

### Clause 102.   American Tax Clause

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, also referred to as the U.S. Tax Reform Act of 1986, including later changes or amendments, levied or income under the laws governing transportation under this Charter Party which begins or ends in the United States and which income under the laws of the United States is treated as U.S. Source Transportation Gross income shall be reimbursed by the Charterers.

### NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Bill of Lading fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

*ADDITIONAL CLAUSES TO THE CHARTER PARTY OF*
*M/V "FUJIAN" DATED FEBRUARY 8ᵀᴴ, 2007*

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

## GENERAL PARAMOUNT CLAUSE

The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract. When no such enactment's in force in the country of shipment, the corresponding legislator of the country of destination shall apply, but in respect of shipments to which no such enactment's are compulsorily applicable, the terms of the said Convention shall apply.

Trades where Hague-Visby Rules apply:

In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels on February 23rd 1968 - the Hague Visby Rules - apply compulsorily, the provisions of the respective legislation shall be considered incorporated in this Bill of Lading. The carrier takes all reservations possible under such applicable legislation, relating to the period before loading and after discharging and while the goods are in the charge of another Carrier, and to deck cargo and live animals.

## U.S.A. CLAUSE PARAMOUNT

This Bill of Lading shall have effect subject to the provisions the Carriage of Goods by Sea Act of the United States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ships and throughout the entire time the goods are in the custody of the carrier. The Carrier shall not be liable in any capacity whatsoever for any

*ADDITIONAL CLAUSES TO THE CHARTER PARTY OF*
*M/V "FUJIAN" DATED FEBRUARY 8TH, 2007*

delay, non-delivery or mis-delivery or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier.

## WAR RISKS CLAUSES

(1) No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the Nation under whose flag the ships sails or by any other Government, the Owner shall discharge the cargo at any other port covered by this Charter Party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

(2) The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the vessel sails or any department thereof, or any person acting or purporting to act with the authority of such Government or of any department thereof, or by any committee or persons having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfilment of the contract voyage and the freight shall be payable accordingly.

*THE OWNERS*                          *THE CHARTERERS*

# EXHIBIT 2

**GURASIS (EX-FUJIAN)**
Account Statement - Provisional Final Hire Payment

| OWNER: | PERSEVERANZA SpA | | Date: | 12-Aug-08 |
|---|---|---|---|---|
| CHARTERER: | AGRENCO MADEIRA COMERCIO INT'L LTD | | | |

Account Statement - Provisional Final Hire Payment
Period: Feb 12 - 1805 GMT, 2007 / Aug 16 - 2359 GMT, 2008

| Vessel: | GURASIS (EX-FUJIAN) |
|---|---|
| C/P Date: | 08.Feb.2007 |
| Delivery | CARBONERAS |
| Redelivery: | AS PER C/P |

| To / Account: | | PERSEVERANZA SpA | | | Debit (US$) | Credit (US$) |
|---|---|---|---|---|---|---|
| TOTAL    551,24583 | DAYS AT USD | | 30.550,00 | por Day | | 15.840,560.11 |
| | | | | | | |
| BALLAST BONUS | GROSS AT USD | | | | | |
| MISC. | DAYS AT USD | | | per Day | | - |
| | | | | | | |
| OFF HIRE 1 - REPAIRS BRINDISI | | | | | | |
| 7,167  DAYS X USD  30.550,00 | | | 4,00% COMMISSION | | 218,941.67 | 8,757.67 |
| FROM:    17/Jun/2007 06:30 LT | TO: | | 24/Jun/2007 09:30 LT | | | |
| IFO:       230,80 | IFO: | | 220,10 | | | |
| MDO:      46,90 | MDO: | | 32,60 | | | |
| OFF HIRE IFO:       10,700 | MT/DAY | | 300,00 USD | | 3,210.00 | |
| OFF HIRE MDO:       14,300 | MT/DAY | | 600,00 USD | | 8.580.00 | |
| C/E/V:     USD PER MONTH OR PRORATA | | | 1.250,00 USD | | 294.52 | |
| | | | | | | |
| OFF HIRE 2 - SINGAPORE - AUXILIARY ENGINE SPARES AND REPAIRS | | | | | | |
| FROM:    05/Jan/2008 02:30 GMT | TO: | | 05/Jan/2008 07:30 GMT | | | |
| 0,20833 DAYS X USD   30.550,00 | | | 4,00% COMMISSION | | 6,364.58 | 254.58 |
| BUNKER CONSUMPTION DUE TO STOPPAGE | | | | | | |
| IFO | 1,300 MTS X USD  300,00 / MT | | | | 390.00 | |
| MDO | 0,400 MTS X USD  600,00 / MT | | | | 240.00 | |
| C/E/V: | USD PER MONTH OR PRORATA | | 1.250,00 | | 8.56 | |
| | | | | | | |
| OFF HIRE 3 - CHANGE OF FLAG | | | | | | |
| FROM:    11/Jul/2008 00:50 GMT | TO: | | 17/Jul/2008 22:30 GMT | | | |
| 3,45000 DAYS X USD   30.550,00 | | | 4,00% COMMISSION | | 105,397.50 | 4,215.90 |
| BUNKER CONSUMPTION DUE TO STOPPAGE | | | | | | |
| IFO | 10,3642 MTS X USD  300,00 / MT | | | | 3,109.26 | |
| MDO | 13,8056 MTS X USD  600,00 / MT | | | | 8,283.36 | |
| C/E/V: | USD PER MONTH OR PRORATA | | 1.250,00 | | 283.68 | |
| | | | | | | |
| COMMISSION: | | ADDRESS: | 4,00% | | 673,622.40 | |
| | | BANCHERO COSTA: | 0,00% | | | |
| DELIVERY BUNKERS: | | IFO: | 1.538,500 | X USD  300,00 | | 461,550.00 |
| | | MDO: | 80,800 | X USD  600,00 | | 48,480.00 |
| REDELY BNKR DEDUCTION: | | IFO: | 690,000 | X USD  300,00 | 207,000.00 | |
| | | MDO: | 45,000 | X USD  600,00 | 27,000.00 | |
| BNKR SHORTAGE ON REDELY: | | IFO: | 800,000 | X USD  395,00 | | 316,000.00 |
| | | MDO: | 15,000 | X USD  570,00 | | 8,550.00 |
| | | | | | | |
| BUNKERS SUBJECT TO RECEIPT OF BUNKER DELY RECEIPT | | | | | | |
| | | | | | | |
| OWNERS EXPENSES | | | | | | |
| Courier Service | | | | | | |
| DE Valencia FM 2007-11-15 to 2007-11-20 | | | | | 2,143.82 | |

GURASIS (EX-FUJIAN)
Account Statement - Provisional Final Hire Payment

| OWNER: | PERSEVERANZA SpA | | Date: | 12-Aug-08 |
|---|---|---|---|---|
| CHARTERER: | AGRENCO MADEIRA COMERCIO INT'L LTD | | | |
| | | | Vessel: | GURASIS (EX-FUJIAN) |
| Account Statement - Provisional Final Hire Payment | | | C/P Date: | 08.Feb.2007 |
| Period: Feb 12 - 1805 GMT, 2007 / Aug 16 - 2359 GMT, 2008 | | | Delivery: | CARBONERAS |
| | | | Redelivery: | AS PER C/P |

| To / Account: | PERSEVERANZA SpA | | | Debit (US$) | Credit (US$) |
|---|---|---|---|---|---|
| OE Yokohama FM 2008-02-04 to 2008-02-07 | | | | 352,95 | |
| OE Valencia FM 2007-11-20 to 2007-11-20 | | | | 573,37 | |
| COMMISSION | 2,50% | | | 75,75 | |
| | | | | | |
| EXPENSES TO ISSUE TAX LOCAL CERTIFICATE, REQUESTED BY AGRENCO | | | | | 1,067.00 |
| | | | | | |
| ONHIRE SURVEY | | USD | 50% | | |
| OFFHIRE SURVEY | | USD | 50% | 250.00 | |
| C/E/V: | USD PER MONTH OR PRORATA | 1250,00 | | | 22,653.94 |
| | | | | | |
| ILOHC | | USD | 53.900,00 | | 53,900.00 |
| KOHSICHANG APRIL '07 | | 4.900,00 | | | |
| RICHARD BAY MAY '07 | | 4.900,00 | | | |
| BRINDISI JUNE '07 | | 4.900,00 | | | |
| IJMUIDEN JULY '07 | | 4.900,00 | | | |
| LIANYUNGANG SEPT '07 | | 4.900,00 | | | |
| NANAO OCTOBER '07 | | 4.900,00 | | | |
| VALENCIA NOVEMBER '07 | | 4.900,00 | | | |
| HUANGPU JANUARY '07 | | 4.900,00 | | | |
| MIZUSHIMA FEBRUARY '07 | | 4.900,00 | | | |
| GLADSTONE MARCH '08 | | 4.900,00 | | | |
| HALDIA APRIL '08 | | 4.900,00 | | | |

| REMITTED: | | | | |
|---|---|---|---|---|
| H/P-01 | 12.Feb.2007 | 950.575,00 USD | | |
| H/P-02 | 27.Feb.2007 | 440.535,44 USD | | |
| H/P-03 | 14.Mar.2007 | 440.536,44 USD | | |
| H/P-04 | 29.Mar.2007 | 440.536,44 USD | | |
| H/P-05 | 13.Apr.2007 | 440.536,44 USD | | |
| H/P-06 | 28.Apr.2007 | 440.536,44 USD | | |
| H/P-07 | 13.May.2007 | 440.936,44 USD | | |
| H/P-08 | 28.May.2007 | 440.536,44 USD | | |
| H/P-09 | 12.Jun.2007 | 440.536,44 USD | | |
| H/P-10 | 27.Jun.2007 | 218.562,44 USD | | |
| H/P-11 | 12.Jul.2007 | 407.053,27 USD | | |
| H/P-12 | 27.Jul.2007 | 440.536,44 USD | | |
| H/P-13 | 11.Aug.2007 | 440.536,44 USD | | |
| H/P-14 | 28.Aug.2007 | 440.536,44 USD | | |
| H/P-15 | 10.Sep.2007 | 440.536,44 USD | | |
| H/P-16 | 25.Sep.2007 | 440.536,44 USD | | |
| H/P-17 | 10.Oct.2007 | 469.936,44 USD | | |
| H/P-18 | 25.Oct.2007 | 440.536,44 USD | | |
| H/P-19 | 09.Nov.2007 | 440.453,44 USD | | |
| Refund of Hire | 24.Nov.2007 | 440.536,44 USD | | |
| H/P-20 | 09.Dec.2007 | 445.174,06 USD | | |

## GURASIS (EX-FUJIAN)
Account Statement - Provisional Final Hire Payment

| OWNER: | PERSEVERANZA SpA | | Date: | 12-Aug-08 |
|---|---|---|---|---|
| CHARTERER: | AGRENCO MADEIRA COMERCIO INT'L LTD | | | |

| | | Vessel: | GURASIS (EX-FUJIAN) |
|---|---|---|---|
| **Account Statement - Provisional Final Hire Payment** | | C/P Date: | 08.Feb.2007 |
| **Period: Feb 12 - 1805 GMT, 2007 / Aug 16 - 2359 GMT, 2008** | | Delivery: | CARBONERAS |
| | | Redelivery: | AS PER C/P |

| To / Account: | PERSEVERANZA SpA | | Debit (US$) | Credit (US$) |
|---|---|---|---|---|
| H/P-21 | 21.Dec.2007 | 440.455,71 USD | | |
| H/P-22 | 05.Jan.2008 | 433.841,24 USD | | |
| H/P-23 | 21.Jan.2008 | 446.422,71 USD | | |
| H/P-24 | 06.Feb.2008 | 440.589,64 USD | | |
| H/P-25 | 21.Feb.2008 | 445,445,00 USD | | |
| H/P-26 | 08.Mar.2008 | 398.685,63 USD | | |
| H/P-27 | 23.Mar.2008 | 441.835,60 USD | | |
| H/P-28 | 07.Apr.2008 | 440.589,94 USD | | |
| H/P-29 | 22.Apr.2008 | 381.114,26 USD | | |
| H/P-30 | 22.Apr.2008 | 69.183,10 USD | | |
| H/P-31 | 07.May.2008 | 440.569,84 USD | | |
| H/P-32 | 22.May.2008 | 440.532,57 USD | | |
| H/P-33 | 08.Jun.2008 | 440.545,00 USD | | |
| H/P-34 | 21.Jun.2008 | 437.321,25 USD | | |
| H/P-35 | 08.Jul.2008 | 433.420.57 USD | | |
| TOTAL REMITTANCES | | USD | 15,876,357.80 | |
| Balance Due To Owners | | | 823,511.98 | |
| | | Sub-Totals | $17,765,989.20 | $17,765,989.20 |

| Due to PERSEVERANZA SpA | $823,511.98 |
|---|---|

Balance Due Remitted To:

Unicredit Banca di Roma
Head office of Napoli
Via Verdi, 31 - 80133 Napoli
Iban: IT11R0300203422USD000055134
SWIFT: UNCRITMM
IN FAVOUR OF: PERSEVERANZA SpA
DETAILS OF PAYMENT: M/V FUJIAN / AGRENCO MADEIRA C/P DD 08/FEB/2007

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
PERSEVERANZA S.P.A.,                                        :
                                                           :
                        Plaintiff,                         :
                                                           :
        - against -                                        :        ECF Case
                                                           :
AGRENCO MADEIRA COMERICO INTERNACIONAL :
LDA, and AGRENCO GROUP a/k/a AGRENCO LTD.,    :
                                                           :
                        Defendants.                        :
-----------------------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                      )        ss: Town of Southport
County of Fairfield   )

        Kevin J. Lennon, being duly sworn, deposes and says:

        1.      I am a member of the Bar of this Court and represent the Plaintiff herein. I am

familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the

issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANTS ARE NOT PRESENT IN THE DISTRICT

        2.      I have attempted to locate the Defendants, AGRENCO MADEIRA COMERICO

INTERNACIONAL LDA and AGRENCO GROUP a/k/a AGRENCO LTD., within this District.

As part of my investigation to locate the Defendant within this District, I checked the telephone

company information directory, as well as the white and yellow pages for New York listed on

the Internet or World Wide Web, and did not find any listing for the Defendant. Finally, I

checked the New York State Department of Corporations' online database which showed no listings or registration for the Defendants.

3.    I submit based on the foregoing that the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendants have, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendants.

5.    This is Plaintiff's first request for this relief made to any Court.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

6.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold property of, for or on account of, the Defendant.

7.    Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

-2-

8.      To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.      Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.     Further, in order to avoid the need to physically serve the garnishees/banks daily and repetitively, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service throughout the remainder of the day upon which service is made commencing from the time of such service; and such service to be further deemed effective through the end of the next business day, provided that another service is made that day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

--3--

Dated:        August 13, 2008
              Southport, CT

Kevin J. Lennon

Sworn and subscribed to before me
this 13th day of August, 2008

Notary Public

—4—